This is our first case of the afternoon in re the marriage of Craig Osborne and Tanya Osborne for the appellant. Mr. Drazen, is that the right way to put it? Drazen and Mr. Scott, you may proceed. May it please the court, justices. Good afternoon, Mr. Scott. My name is Jim Drazen, and I represent the appellant in this case, Tanya Osborne. This case has to do with the termination of maintenance. Judgment of disillusioned marriage was entered in this case in April of 2011. At that point in time, Mr. Osborne, a dentist, was ordered to pay maintenance in increasing amounts starting at $4,000-$5,000 per month and increasing to a total of $7,000 per month. Shortly after the divorce was finalized, my client, Tanya Osborne, moved to Highlands, Illinois, and she sought to start a business and started a business known as Anchors Away. Anchors Away was a business designed to flip houses. She needed other people involved in her in her business. She contacted a gentleman by the name of Schneider. She also contacted a friend of hers, but ultimately her and Mr. Schneider were the only people that that got involved in this particular business. They ultimately ended up being involved in two different properties and they rented those properties, they rehabbed those properties. At the time of trial, they were actually ongoing rentals and the money was going into Anchors Away. The problem arose because they didn't do a very good accounting business. With regard to this Anchors Away business, money went from one account to another. In fact, their accountant, a lady by the name of Young, testified that that was kind of a normal thing to have happen, but that they shouldn't have done the manipulation of the monies from a personal account to a business account because they basically didn't start off with a business account at all. What happened ultimately was Ms. Osborne and Mr. Schneider created this business. It was created at her residence on Steinkenning Road, Steinkenning School Road in Highland, Illinois. They had a Morton building, a metal building in the back that they used as their business building and they'd bring clients in there and they'd do some of the repairs that they'd take out to the various job sites, the two job sites that they had at this point in time, and perform those services on the jobs themselves. Mr. Schneider had acquired one piece of property. It was in St. Louis. It's called the Hallwood property, while Ms. Osborne had acquired the property located on Dartmoor and that was in Illinois and they continued to work on that property together through 2013. During that time period, Ms. Osborne did engage in a sexual relationship with Mr. Schneider. She testified that she engaged in a sexual relationship. It was not an ongoing or a continual relationship, but it was in fact a relationship. She also testified that she had relationships with other people during the time periods in which the time in question. Why does that matter? Well, because most of the court cases, Your Honor, and I'm going to, I refer to Bates, Sappington, and Miller in my brief, they all talk about exclusivity of a relationship. The idea of having an exclusive relationship is one of those things that the courts have looked to to determine whether or not this is in fact a de facto husband-and-wife relationship. So the trial court was wrong in its assessment as follows. Ms. Tanya seems to be arguing that since she was involved in sexual relations with other men while she was involved with Schneider, that somehow negated the de facto husband-and-wife relationship. The court is at a difficult time trying to understand how, simply because respondent pulled around a lot, that that somehow negated her de facto marriage. Well, and if you look a little further, I disagree with the court in that analysis and here's why. The court equated a de facto marriage with a marriage. The difference between a de facto marriage and a marriage, as set forth by the, by the cases that I've cited, is that commitment factor. The commitment that you get with a marriage is the actual marriage itself, the license you get. So the legislature intended that if a person receiving maintenance engages in a conjugal, ongoing, sexual relationship with a third party, that the terminated. But if that person sleeps around with lots of people, in addition to the other one, that, that's okay. Well, actually, Your Honor, the cases indicate that it's on a case-by-case basis you look at it. But one of the things you look to is the exclusivity of the situation. So in this particular case, assuming for the moment the evidence had been sufficient that she was engaging in this ongoing sexual relationship with Schneider, it would have been enough to warn terminating maintenance that termination of maintenance was trumped by the fact that she was also sleeping around with lots of other guys. There were a whole bunch of other factors also, Your Honor, but that was one of them. Well, no, it's, my question was, would the fact that she was sleeping around with a bunch of other guys trump the fact that she had this ongoing sexual relationship with Schneider? That factor alone, Your Honor, probably would not. However, that factor is one of the many factors you have to look at. Is there any case like this one when the court spoke of the exclusivity of the relationship showing that, that, in fact, a party objecting to the termination of maintenance had ongoing sexual relationships with multiple partners? I'm not aware, Your Honor, of a case in that particular situation. So we'd be the first to so hold that that somehow was a mitigating factor when it comes to terminating maintenance? I would think not, Your Honor. The reason why I'm not familiar with that at this particular point in time is because if that was the sole factor that the court was looking at, and I'm sure there are cases on that. But your argument is, even if it's not the sole factor, it is a mitigating factor. Isn't that your argument? Well, I believe that's what the, that's what the Supreme Court has said. Is that your argument? Yes, Your Honor. Okay. In fact, the court, the lower court, the trial court, in this particular case said that the seminal case on this, on this issue was the Heron case. It looked to the six factors that were in the, in that particular Heron case to determine whether or not it should, it should terminate maintenance in this particular case. Those six factors had to do with the length of the relationship, the time the party and her friend spent together, the nature of their activities, the interrelationship of personal affairs, vacations, and holidays. If you look at the Heron, holidays spent together, if you look at the Heron case, first of all, if you look at the Heron case itself, those factors don't match up with the factors in this particular case. In the Heron case, the party spent most holidays together. In our case, there was a Thanksgiving Day gathering that my client had where she had invited a number of people. He was one of the people that got invited. In addition to that, there was one Christmas where he had worked at the house that night, spent the night there, and left the next morning when he got a ride from his mother, and she had Christmas with her family at that point in time. There's no holidays spent together. They talk about gifts being bought back and forth. There's no gifts being bought back and forth. In fact, Mr. Schneider never bought gifts for my client. My client, Ms. Osborne, says that at one particular point in time, before this issue came up, before the alleged relationship started, she had been invited to a birthday party of his, along with a group of other people, and they all brought small gifts. The only other gift that she got was a gift that she bought in her business relationship, and she bought two wallets, two $16 wallets, I believe they were. Maybe they were $16 total, and she gave one wallet to another business acquaintance of hers, and one wallet to this particular individual. Other than that, there's no gifts, no personal gifts of any nature. Also, with regard to the Heron case, they talked about the number of the numerous vacations that the parties took together. In our case, there is one, and this vacation arose because my client's daughter is a special needs child. She was allowed a cruise through the Make-A-Wish Foundation. She had originally asked, she was able to have her friend go with her, and she was allowed to bring two other people. She had asked her mother and her aunt to go. When her aunt couldn't go, she asked Mr. Schneider to go along with her. Other than that, no vacations together. They don't spend time together. They didn't, the only time that they spent together was, or the major time that they spent together, was in business-related activities. They talked about... Did your client have a credibility problem? I mean, was the court required to accept the explanation for the co-mingling of the funds? Was the court required to accept the explanation as to why he listed her home as his residence on his tax, I mean, I'm sorry, on his bankruptcy filings? I mean, weren't those credibility issues? I think those, in some respects, are credibility issues, Your Honor, but like the court stated in the Miller case that I cited, those credibility issues sometimes can be taken to an illogical extreme. My client didn't fill out any of the bankruptcy schedules. She didn't fill out any of the paperwork that went on his paycheck stubs. She didn't fill out any of the work that went into his divorce. She filled out her own, her own paperwork, and so she never had anything to do with that. It would be akin to making my client responsible for the actions of a third party with regard to termination of maintenance. Didn't you call Schneider to testify? I did not, Your Honor. The opposing party did. Okay. Go ahead. And the court allowed him to testify as an adverse witness, but at that time, he testified that based upon the testimony of his, of his attorney, he made up stuff. He didn't even mention the anchors away property. There were a whole bunch of things that he did, and the question, I think the important question for this court at this point in time, is when he testified at trial, he opened himself up for a perjury charge on the bankruptcy case, and he said, even though I'm opening myself up for that charge, I'm going to testify truthfully here, and he said we weren't, we weren't living together. In fact, one of the issues that came up was the alleged credibility of his bankruptcy attorney. His bankruptcy attorney admitted on cross-examination that one of the things he kind of got wrong was he listed my client as his fiancée. The only way that ever came to light, my client, Mr. Schneider signed those, those bankruptcy papers, went into the meeting of creditors, the only way it came to light was when somebody asked him that question, he said, she's not my fiancée, she's just a girlfriend. She's a girlfriend just like the other witnesses that testified for us said, she was a girlfriend of theirs as well. Again, I believe this gets back to the, the Supreme Court's decisions with regard to Bates and, and the Sappington case basically involved a question of whether or not there was actually a sexual relationship, but they did state a couple of things that were important. They stated that in that particular case, Mr. Montgomery had paid the household expenses for Ms. Sappington. Well, in our case, the only expense that ever got paid by Mr. Schneider was a water bill, and they both testified that that was his contribution to the business expenses because the business was located on the same property. He didn't pay any utilities of hers, he didn't pay any cable bills, he didn't pay any rent payments, he didn't pay any of those other things at all. How about what she did for him? Well, the only thing that she had done, Your Honor, Mr. Schneider had to pay his divorce attorney's fees. She loaned some money. He paid his, he paid his union dues. She did that on it for one day, Your Honor, because he needed to pay it on a day, and he didn't have a checkbook. The testimony was he didn't have his checkbook with him, so she gave him a check to pay the union dues. The next day it got paid back. That would be akin... Going back to credibility, though, what, was anybody able to demonstrate any, any documentary evidence about how much she lent him for the attorney's fees, and when or if he paid it back? Well, there was testimony on that, Your Honor. Testimony? That came from the accountant, who looked through, in her accounting papers that were, that were put in, she said that those were listed as, as loans against his equity in the business. Against his equity in the business. What equity did he have in, I mean, they got two rental houses? Right, where, and, and... This is their business? Their business was flipping the houses and either renting them or ultimately selling them. But they didn't flip any, they had two that they rent. That they turned out, that they've turned out to be renting at the time of trial. That's correct. What else does, what else does your client do? She works in an office in Imperial, I think it's Imperial, Missouri. She's an account manager. How about her gentleman friend? He works in a, in the, in the construction industry as well, and I don't really recall exactly what that was. They had, they had a separate business also. But with regard to, I think it's important to look to the issues which, which the Supreme Court has talked about. In Bates, the Bates court went on to say, they talked about something called an intimate dating relationship, and they said an intimate dating relationship does not, does not create a de facto marriage. That leads us to the Miller case, which kind of outlined and went through and delineated all of the factors that were set forth in the Heron case. Ultimately, what the Miller court said was the Heron case is a place to start, but just having something in one of those places, as was hap, as happened for Lorena Miller in the Miller case, doesn't mean you have a, a and the Saffrington case for this theory was, is there an element of permanence? Is there an element of, of exclusivity? And is there an element of mutual commitment? Everything we got from this case indicated that while there was commitment to this business, there was no commitment to exclusivity. They, they clearly stated that throughout this entire time that they were running this business, he knew she was dating other people. He knew she was dating other people. They didn't go to the movies as, as the Millers did. They didn't have a, they didn't buy a, a, a membership to a golf course as it, as happened in the Millers, and still the court held that it didn't have that element of exclusivity that you have to look to in order to terminate maintenance. So what the court was saying was if you don't have a commitment that creates a marriage-like relationship, you don't have a de facto marriage. In the case at hand, we don't have anything that even comes close to even an intimate dating relationship. And in our particular case, what happened was the parties, as, as Ms. Osborne had done with other people, and Mr., and Mr. Schneider had done with other people. And I would suspect many other people have done with other people as they've dated several different individuals. And they're dating a lot of different individuals. And while you're dating, sometimes you have sexual relations. Not a, it doesn't create a de facto marriage just because you've had a sexual relation. In fact, that's exactly what Sappington said. You don't have to have sexual relations in order to have a de facto marriage. Sappington Court looked to that again, that element of permanence, that element of exclusivity, in order to create that marital relationship. In our case, Your Honors, what the court had, or what the parties had, is they had a business relationship. And that business relationship required my, my client to come up with the finances for the most part on it, and Mr. Schneider to come up with the work on it. And, and in order to make the business run, my client had to make sure Mr. Schneider gets to work. In order to make sure he gets to work, sometimes she had to loan him some money. But, as Ms. Young said, the accountant said, they were all paid back. They're all paid back, or about to be paid back, and they're all listed in the, in the business, in the business information, all in the business accounts. That's akin to what the Miller Court said, when the Miller Court said that even in business relationships, parties commingle a lot of funds. It happens all the time, but it doesn't create a marital relationship. It doesn't create a de facto marriage. In order to create that de facto marriage, you need something more than that. I believe what the legislature has done now with their change in the maintenance statutes, is to say, we need to take a harder look at this issue of maintenance, and therefore, this issue of termination of maintenance. It can't just be that you've had a sexual relationship with somebody, or it can't just be that you went on, that you, that you were at the same place for a vacation, or that you went out to dinner with somebody, or you went to movies with somebody. None of which was testified to in our particular case. No movies, no dates, no going out to other places. The only time they went to dinner together, both of them testified, it was, it was unimpeached, was for business purposes only, and it was written off as a business expense. So they handled that, they handled their business, albeit not really well. Ms. Young testified that this is kind of a common thing for these people to get, for people to get involved in when they have a business relationship. They tend to do things kind of on the wing, on the prayer, and hope like heck it works itself out at the end. The judge indicated that he was surprised that they finally figured out who made what contribution shortly before trial. Ms. Young said that's not a very unusual thing when parties are trying to get a business up and running. There were a number of things that were done that were done kind of haphazardly. They made bad investments, that one was to buy this key man insurance, which was supposed to be able to insure people's lives in the business, and yet at the same time they were supposed to be able to use that to reinvest the monies into something else, and all it did was lose money. Eventually my client had to cash that back in and take that back out of the business because it wasn't making any money. They took a business course for the business on how to sell real estate, a computer course. It really wasn't, according to the testimony, it didn't turn out to be the great course that they thought it was going to be with all the CD discs, but it was something that they had seen and had been advertised to them, so they went ahead and took this course. I won't disagree with the court if the court says these parties didn't make real good investments of their time, their energy, their monies, but does that create a de facto marital relationship? I don't think so. I believe, as the Supreme Court has said, and as Miller said, you've got to look to those elements of, did they want to make it permanent? Was there something that they did that said, I'm making this permanent, I'm holding this out as permanent. Even in the Miller case, where the parties had a family Christmas picture taken, they posted it on Facebook, the court held that's not enough to say we now have a family permanent relationship. We don't have anything like that. What we've got is two people getting involved in a business relationship that end up also having a sexual relationship, and when those business relationships get involved, as the Miller court said, there's often a kind of a crazy commingling of funds. As Young testified, the exact same thing. That's what makes this case unique from the other cases that are on the issue of termination of maintenance. These parties were actually in business long before anything happened. So therefore, our request would be that this court reverse the lower court's position on the termination of maintenance, reinstate my client's maintenance, including any back payments. Thank you. Thank you, counsel. Mr. Scott? I believe that the trial court was correct in its determination that there was, in fact, a de facto husband-and-wife relationship in this situation. There's a couple areas that that differ from the Bates case that the counsel relies upon. One of them is these people live together. Now, this judge heard all the explanations and looked at all of the documentary evidence that they live together, and I'll go through. The bankruptcy petition wasn't hers, but he says, I've lived here from August of 2011 to April of 2013. He goes to the trial court. He's examined by the trustee, says it again, says that I paid for expenses of Tanya. I lived in her house. We shared expenses. She paid expenses for me. He gets examined by his ex-wife's divorce attorney, admits it again. Then he says, these schedules are wrong. So the trustee says, well, sir, you're under oath. You understand this is perjury. You understand that you have to be absolutely 100% correct. You go back to your divorce attorney. He goes back. Not only does he fill out an amended one that says he is living with her again, he fills out an affidavit, a separate affidavit. We're living together. We're sharing expenses, and we're living in the same home. Those are just the bankruptcies. It's also important to note that Ms. Osborne went with him the first time he went to the divorce attorney, Mr. Johnson, and he filled out Exhibit 46 that says he's living with her. No questions. No, you know, I'm not living here, or maybe I'm not living here, whatever. Tax returns, which she helps him fill out. They go to an accountant that she picks up. He lists her address as his address. This Hallwood property that he buys, and he testifies it's not investment property at the bankruptcy. He lists that as the address where he's living for the residents of the grantee at her address. The tax bill comes to her address. His paychecks, his W-2, his credit card, his retirement accounts. And what's really interesting is, and the judge pointed out to this, his bank account records. His bank account records start out at a place called, I believe, St. Jacob, Illinois, which is where, you know, he lived, where he had his mail sent. I think it's his mom's address. Up until the time he started living with Tanya. Then his bank records go to her address, and they stay at her address until he moves out to Hallwood, and then they move to Hallwood. Same thing with his credit card. All of this the judge takes into account when he makes the determination, you two were living together. And what brought this, I think, even closer or to a head to the trial court, and I know a number of you have sat on the trial court bench. You got to choose, you know, credibility. Tanya attempts to introduce this respondent's exhibit number one, which is the lease that he says he had where he was really living. Belleville, Illinois. It's not even in his name. And he couldn't answer basic questions. The lease says you got to pay $200 plus utilities. He filed an affidavit contemporaneous to the same time with the divorce court saying he's paying $600 a month rent. On top of that, he couldn't explain how come there's no checks, there's no receipts, there's no evidence he's even paying this. So then he comes up with this new idea that, oh, I'm working off part of the rent. But he couldn't answer my simple questions. Why are you working off rent you don't own? You don't owe, excuse me. Couldn't even answer. I mean, you know, the judge did a great job cutting through, finding out what truly was happening. The other thing that I think that the counsel ignores is that in the documentation given to the accountant, if you can recall the record, Ms. Osborne did the books for Mr. Snyder that she gave to the accountant to do the taxes. She also did her own to do the taxes and for the anchors away. And in there, in hers for 2012, in her initial documentation she gave, there's a whole section of payments for Mr. Osborne. And there are her handwritten notes which say not shareholder contributions for groceries, for law expense. These people were living as husband and wife. Just the things they commingled. The court couldn't ignore that. In fact, the evidence is so overwhelming in this case. I mean, this guy gets busted, hauled into jail, who bails him out? She needs medicine. She gives him his ATM card to go down, take money out of the account, and get her medicine. She bought him a Christmas present. She bought him a birthday present. Big present givers, no. Big vacation people, no. They went on to one in North Carolina where he helped repair some work at her son's house, the other one, the Make-A-Wish one. But she only went on one other vacation, and that was with her dad, and I think her sister. But she doesn't go on a lot of vacations. Neither does Mr. Snyder. Commingling of funds is so strong in this case. They operate out of one bank account. He has his own, but they put money back and forth. I had innumerable exhibits. 500 here, 550 there, 800 there. She supposedly bought his truck right before the bankruptcy for 500 bucks. He kept, he drove it continuously. It was his car, his truck. He had his own key. Although he didn't have a driver's license, but he still drove it. He went where he wanted to go. She paid for the insurance. She paid for the repair, and it was supposedly her truck. Another thing that's a key that this court, I think the trial court saw through, is he claimed in his bankruptcy he owed her $6,300. She claimed, oh yes, he owes me $6,300. Then she also claimed that was my investment in Hallwood property that's in his name. Then he borrows money on Hallwood to try and make another investment, supposedly in both of their behalf. When that falls through, the money comes back, and he puts the money into her account. He sells equipment. He sells a tractor, gives her the money. And this life insurance, key man insurance, key man insurance is not paid to your children. Her life insurance policy, the beneficiaries were Mr. Snyder and her children. Key man insurance comes back to the company. Key man insurance is to insure an operation of a successful company. This company was never successful. This company would never warrant that kind of insurance expense, even if it's a dumb business decision, as I'm sure Mr. Drazen is going to tell you. But it is not key man insurance. And her insurance policy, or his insurance policy, went to her. When they cashed it in, where'd the money go? Back into the commingled funds. I would dare say it would cost you hundreds of thousands of dollars to try and figure out whose money's who in her bank account. Because they're both dumping money in there. It's commingled, just like a husband and wife. I got money today, you pay for dinner. You know, that kind of thing. They go out to eat, and he says, well, it's deductible, and that's why they did that. Look at the tax returns. Very little deduction for meals. In fact, I asked her, if you're eating out two or three times a week for business, how come you're not deducting? You got this little dinky amount. So, in total, these people are living as husband and wife. It is the most obvious case of cohabitation and a continuing de facto husband and wife relationship that I've run across in a long time. Usually, I don't have this much evidence. Usually, you have a little bit. But they have a sexual relationship. They have a personal relationship. They assist each other. When someone needs something, they loan money to the other person. She paid for his first installment payment on his Chapter 13 bankruptcy. She paid his union dues. I would ask counsel to point out in the record wherever that ever got paid back, because it wasn't in her financial records. She paid for his divorce attorney. She paid for his ex-wife's divorce attorney. All of these are husband and wife type of actions. The real estate program that they went to came out of her money, over $6,800. I said the life insurance. Hallwood was in his name alone. And she spent thousands of dollars from the account into the Hallwood property. Same with Dartmoor. Thousands of dollars into Dartmoor, they both shared in the rental income. They both shared in the Hallwood income. Anchors Away wasn't even listed on anything in his bankruptcy. In fact, he said, I don't have any businesses, because all my business before, my construction business, is defunct. So he supposedly is in business. And he is lying three times that he's in business. But yet his actions say he's in business with her. And then he comes to this court and he says, oh, judge, you have to believe me that I wasn't living with her. I wasn't commingling. I wasn't acting in this husband and wife relationship, because I lied at the bankruptcy court. Come on. What kind of credibility does he have? And when you look at the documents, what kind of credibility does she have? Judge Pistorius spent a lot of time going through and analyzing the evidence. The question before you is, is his decision against the manifest way to the evidence? And I would submit to you, his decision is totally supported by the manifest way to the evidence. And if it was a contrary decision, it would be against the manifest way to the evidence. We would ask the court to affirm. Thank you. Thank you. Rebella? Thank you, Your Honor. First of all, with regard to counsel's last point, the court stated that as further evidence of the de facto relationship was that they admitted to a longstanding sexual relationship. He's looking at the sexual relationship as the indicia of a de facto marriage. In fact, that's not what Bates or Sappington, or ultimately right after this case was Miller say. They say it's something totally different from that. With regard to the information that we've received that says they loan money back and forth, testimony is exactly the opposite. My client says he never loaned me a dime. Not a dime. Never gave me gifts. Never celebrated holidays with me. Took the one vacation with me. The other item they talked about was her son had an issue that he needed something fixed at his house in North Carolina. She asked if he'd come and help work on it. And that's it. There's no trips. There's no vacations. There's no nothing. With regard to the life insurance, they met at a real estate conference. This individual who said you can invest in this and you can use this to help fund other businesses. They lost, in fact, Tanya lost a lot of money as a result of it. But with regard to his obligation with respect to Hallwood, he had a $6,300 obligation to the business. That's a loan and it's marked as a loan inside the corporate books. With regard to his lease, there's a lease. It's a formal lease. They copied it off. But he signed it and indicated it in testimony. This is where I lived during the important times. We had a witness who testified. I spent a large period of time there, two or three days a week, and I only saw him for six months. I only saw him a couple of times. And he never spent the night. How is that a longstanding de facto husband and wife relationship when he's not spending the night there and she doesn't see him but a couple of times in two or three months? This is not a situation where the parties have said we're going to make this permanent. And the thing I would like to close with for the court was, is this a situation where Tanya Osborne said, I want to make this a permanent relationship. I'm going to hold this out as permanent. We're going to make a mutual commitment to each other. We've got that gravitas of longevity and permanence. They don't have that in this particular case. They've got less here than they have in many of the cases where the courts have rightfully held it's not a husband and wife relationship. I don't even believe this is an intimate dating relationship as defined by Sappington. But even if it is, it's certainly not enough to terminate my client's maintenance. We would ask the court to reverse this lower court's decision. Thank you. I take the matter under advisement and await the readiness of the next case.